## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **DEBRA M. LAWSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3-03-1086** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff

was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended.

The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record.[1]

Docket Entry No. 7.  Defendant has filed a Response, arguing that the decision of the

Commissioner was supported by substantial evidence and should be affirmed.  Docket Entry No.

8.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner

be AFFIRMED.

---

[1]Plaintiff did not file a Motion, per se, but did file "Plaintiff's Brief in Support of Motion
for Judgment on the Administrative Record," which will suffice.  Docket Entry No. 7.

1

## I. INTRODUCTION

Plaintiff filed her applications for DIB and SSI on September 6, 2000, alleging that she had been disabled since June 30, 1999, due to back pain, blood pressure, and acute depression. Docket Entry No. 5, Attachment ("TR"), p. 16, 57-63. Plaintiff's applications were denied both initially (TR 37-38, 41-45) and upon reconsideration (TR 39-40, 48-49).[2] Plaintiff subsequently requested (TR 50-52) and received (TR 570-603) a hearing. Plaintiff's hearing was conducted on August 15, 2002, by Administrative Law Judge ("ALJ"), Mack H. Cherry. TR 570. Plaintiff and vocational expert ("VE"), Jane Brenton, appeared and testified. *Id.*

On February 28, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 13-29. Specifically, the ALJ made the following findings of fact:

1.   The claimant has met the disability insured status requirements under Title II of the Act as of June 30, 1999, her alleged disability onset date, and she continues to satisfy such requirements through at least the date of this decision.

2.   For the reasons cited in the text of this decision, the claimant has not engaged in SGA (substantial gainful activity) since June 30, 1999.

3.   The medical evidence establishes that the claimant has "severe" impairments due to a polysubstance (alcohol, cannabis, and cocaine) abuse/addiction disorder with secondary depression and anxiety, obesity, and recurrent wound impairments following surgical procedures involving the lower abdominal wall.

---

[2]The "List of Exhibits" indicates that TR 48-49 pertains to the initial "SSI" determination, but "DIB" is checked on the form. The record contains a "Notice of Disapproved Claims" for SSI. TR 41-45.

2

4. Considering the claimant's drug and alcohol abuse/ addiction problems, her mental problems meet in severity the listed criteria found in Section 12.09(B), in Appendix 1 to Subpart P, or Regulations No. 4[.]

5. Absent consideration of the claimant's alcohol and drug addiction disorders, she does not have an impairment or combination of impairments that, either singularly or in combination, meets or equals in severity any listed criteria found in Appendix 1, Subpart P to Regulations No. 4.

6. The allegations by the claimant regarding disabling symptoms, including pain and depression, are, for all of the reasons cited in the text of this decision, inconsistent with the non-medical and medical evidence of record as a whole and are simply not credible (20 CFR 404.1529/416.929 and SSR 96-7p).

8.[*sic*] Considering only the limitations that would remain if the claimant stopped consuming alcohol and using illicit drugs, she has the RFC (residual functional capacity) to perform a the [*sic*] modified but substantial range of unskilled light work activity that is set forth in the text of this decision (20 CFR 404.1545/404.1567, 20 CFR 416.945/416.967, and SSRs 83-10/96-8p).

9. Considering only those limitations that would remain if the claimant stopped abusing alcohol and using drugs, she retains the RFC to perform her past relevant work as a fast food cashier, thereby warranting a finding of "not disabled" (20 CFR 404.1520(e)/404.1565, 20 CFR 416.920(e)/ 416.965, and SSRs 82-61/82-62).

10. The claimant is 40 years old, which puts her in the regulatory age category of a "younger individual" (20 CFR 404.1563 and 416.963).

11. The claimant has a limited (10th grade) education and is literate (20 CFR 404.1564 and 416.964).

12. Considering the claimant's relatively young age and established RFC, the issues regarding transferable skills are immaterial (20 CFR 404.1568 and 416.968).

3

13. Assuming *arguendo* the claimant is unable to perform all of the jobs comprising her past relevant work experience and considering her age, education, work experience, and RFC that would remain if she stopped using drugs and alcohol, she can be expected to perform alternate work that exists in significant numbers in the national economy, thereby warranting an alternate finding of "not disabled" within the framework for reference provided by Rules 202.18/202.19, in Table No. 2, in Appendix 2 to Subpart P, of Regulations No. 4 and the vocational expert's testimony.

14. The claimant's limitations that would remain if she stopped abusing drugs and drinking alcohol are *not disabling* (20 CFR 404.1535 and 416.935).

13.[*sic*] The claimant's drug and alcohol addiction disorder is very material to the previously cited conclusion of "disability", [*sic*] as reflected under finding No. 4, above (20 CFR 404.1535 and 416.935).

14.[*sic*] The claimant *cannot be found* to be under a "disability" because of the materiality of prolonged drug and alcohol addiction (P.L. 104-121).

TR 28-29 (italics in original).

On March 3, 2003, Plaintiff timely filed a request for review of the hearing decision. TR 11-12. On July 1, 2003, the Appeals Council granted a 25-day extension for receipt of additional evidence (TR 10), and, on October 20, 2003, the Appeals Council issued an "Order of Appeals Council" to make additional evidence a part of the record (TR 9). Also on October 20, 2003, the Appeals Council issued a letter declining to review the case (TR 6-8), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to back pain, blood pressure, and acute depression.  TR 16, 57-63.

On January 12, 1993, Dr. Abdul S. Enayat treated Plaintiff at Centennial Medical Center ("CMC") for her complaint of low back pain.  TR 484-485.  Upon physical examination, Dr. Enayat found that Plaintiff had "no focal deficit," her "[s]traight leg raise test was negative," and her "DTRs were within normal limits."  TR 484.  Dr. Enayat ordered laboratory work, which revealed that the "LSN was negative" (TR 484); an X-ray of Plaintiff's lumbar spine revealed "no significant abnormality" (TR 485).

On April 7, 1993, Dr. David Bridges treated Plaintiff for complaints of "low back pain" and "chest pain."  TR 483.[3]  Dr. Bridges diagnosed Plaintiff with "low back strain" and "lumbar strain."  TR 483.  Dr. Bridges recommended "[b]edrest" and advised Plaintiff to take her medications as directed.  *Id.*

On March 16, 1994, Physical Therapist Carolyn Musfeldt treated Plaintiff for "minimal to moderate pain in right forearm" and complaints of "tingling" in her hand.  TR 405.  Ms. Musfeldt recommended that Plaintiff undergo physical therapy twice a week for four to six weeks.  *Id.*

An April 20, 1994 report from the "Rehabilitation and Sports Medicine" center indicated that Plaintiff was "reporting significant improvement in wrist and forearm pain in past 2 weeks."

---

[3]The record is partially illegible, and there is no mention in the legible portions, about Dr. Bridges ordering tests or conducting a physical examination.  TR 483.

5

TR 404.

On May 6, 1994, Ms. Musfeldt reported Plaintiff's progress and problems after lifting a heavy bag. TR 403. A May 31, 1994 report recorded that Plaintiff did not have "any further re-injuries or setbacks regarding her wrist in the past few weeks and has been making steady progress in her strengthening program." TR 402.

On May 2, 1995, Plaintiff was transferred to Centennial Parthenon Pavilion ("CPP") from the St. Thomas Hospital Emergency Room ("ER"), where she had been treated for an overdose of Sinequan. TR 481. Dr. Richard Treadway evaluated Plaintiff at CPP, and noted that she had become "suicidal" because her aunt had become "critically ill." TR 479-482. Dr. Treadway assessed Plaintiff as: "Axis I: Recurrent major depression, severe, without psychosis. Axis II: No personality disorder. Axis III: Drug overdose in apparent suicide attempt. Axis IV: Severe stress. Axis V: Current GAF score of 30, best GAF score past year 50." *Id.*

On May 15, 1995, Plaintiff was again admitted to CPP following treatment at the St. Thomas ER for "severe depression associated with suicidal ideation." TR 118. Dr. Treadway recorded Plaintiff's social history, including her abusive marriage, her husband's alcohol problems, and her prior suicide attempts in 1980 and on May 2, 1995. *Id.* Upon admission, Dr. Treadway indicated that Plaintiff admitted to having "strong suicidal impulses" and manifested a "depressed affect and mood." *Id.* Dr. Treadway prescribed Trofanil and Desyrel, and recorded Plaintiff's positive response to her medication. TR 119. Plaintiff's diagnoses upon admission were: "Axis I: Recurrent major depression, severe, without psychosis. Axis II: Dependent personality. Axis III: Multiple drug overdoses in past. Axis IV: Severe stress. Axis V: GAF score of 30. Best GAF score past year of 50." TR 118. Plaintiff's "final" diagnoses did not

6

differ.  *Id.*

On May 18, 1995, Dr. Treadway and Dr. Lloyd K. Huang treated Plaintiff for "sinus drainage and wheezing," "nausea and vomiting and dyspepsia," and her report that she was "hit in the head with a hammer by her husband."  TR 477.  Upon physical examination, Dr. Treadway and Dr. Huang found that Plaintiff had a "mild wheeze," but that her "extremities" were "normal."  *Id.*  Dr. Treadway and Dr. Huang ordered laboratory work, which revealed, "white count of 10,900," "[h]ematocrit 42," "[n]ormal electrolytes except her total protein and albumen are slightly low with normal thyroid functions," and "[n]egative RPR."  *Id.*  Dr. Treadway and Dr. Huang diagnosed Plaintiff with "[d]epression" and "[b]ronchitis."  *Id.*  Dr. Treadway and Dr. Huang advised Plaintiff to take Robitussin and to stop smoking.  *Id.*

On January 27, 1996, because of her "depression and psychotic symptoms," Plaintiff was again admitted to CPP; she was discharged on January 29, 1996.  TR 120.  Dr. Daniel Javier reported that this was Plaintiff's "third Parthenon Pavilion admission."  *Id.*  Dr. Javier indicated that Plaintiff "continued to have depression accompanied by frequent crying spells, dysphoria, anhedonia, poor energy level, poor appetite, and poor sleep."  *Id.*  Dr. Javier also noted Plaintiff's report that her husband wanted her to die, that he accused her of infidelity while she was "tripping on crack," and that he had been arrested.  *Id.*  Dr. Javier reported that, while at CPP, Plaintiff's energy level had "slightly improved," but she "continued to remain somewhat anxious, irritable and disheveled."  *Id.*  Dr. Javier recommended that Plaintiff "pursue [p]artial [h]ospitalization so that we could better assess her depressive symptoms, continue individual and group therapy and consider restarting her antidepressant."  *Id.*  Plaintiff's diagnoses upon admission were: "Axis I: Major depression.  Axis II: Dependent personality disorder.  Axis III:

7

Multiple drug overdoses in the past.  Axis IV: Marital issues and interpersonal difficulties with husband's probation officer.  Axis V: Current GAF 40, past year GAF 50."  *Id.*  Plaintiff's "final diagnoses" were: "Axis I: Major depression, recurrent, severe without psychosis.  Axis II: Dependent personality disorder.  Axis III: Multiple drug overdoses in the past.  Axis IV: Marital issues and interpersonal difficulties.  Axis V: Current GAF 50, past year GAF 50."  *Id.*

On April 14, 1996, Plaintiff was admitted to CPP, because of her "suicidal ideation with a plan," as well as her "homicidal impulses with plan directed towards her husband of 11 years." TR 122.  Dr. Treadway treated Plaintiff, and noted that she remained married to her abusive husband, but stated that she planned to divorce him.  *Id.*  Dr. Treadway also noted that Plaintiff again became "suicidal" after her husband called her on April 15, 1996.  *Id.*  Dr. Treadway recorded that Plaintiff also reported that her husband had tried to "suffocate her with a pillow," and that she feared that her husband would "sneak into the hospital to try to harm her or kill her." *Id.*  Dr. Treadway found that Plaintiff had lost 30 pounds over the previous four months, and had been using crack cocaine for the past nine months.  *Id.*  Plaintiff was discharged from CPP on April 19, 1996, at which time she was not suicidal, homicidal, or showing signs of psychosis, nor did she manifest withdrawal symptoms or side-effects from her medication.  *Id.*  Dr. Treadway instructed Plaintiff to attend "AA/NA" and "Dual Recovery Anonymous" meetings.  TR 123. Dr. Treadway's "final impression" of Plaintiff was: "Axis I: Recurrent major depression. Polysubstance abuse.  Axis II: Borderline personality.  Axis III: Chronic obstructive pulmonary disease.  Axis IV: Severe stress.  Axis V: GAF score of 30, best GAF score in the past year 50." TR 122.  Dr. Treadway prescribed Tagamet and Imipramine.  TR 124.

On August 4, 1996, Dr. David N. Carnahan treated Plaintiff at the CMC ER for "facial

contusions" on her left cheek.  TR 177.[4]  Dr. Carnahan ordered an X-ray of Plaintiff's facial

bones (TR 177), which revealed "[n]o fracture or radiodense foreign body" (TR 176).  Dr.

Carnahan diagnosed Plaintiff with "cheek/facial contusions," "drug abuse," and right "otisis

media."  TR 177.  Dr. Carnahan instructed Plaintiff to take Tylenol.  *Id.*

On December 13, 1997, Dr. Carnahan treated Plaintiff for her complaint of cough, cold,

and wheezing.  TR 173.  Dr. Carnahan ordered a "PA and Lateral Chest" X-ray, which revealed

"normal" and "unremarkable" results.  TR 174.  Dr. Carnahan diagnosed Plaintiff with

"[b]ronchitis" and advised her to stop smoking.  TR 173.

On February 15, 1998, Dr. Mark T. Byram treated Plaintiff for her complaint of breathing

difficulties.  TR 170-172.  Upon physical examination, Dr. Byram found that Plaintiff's neck

was "tender."  TR 170.  Dr. Byram ordered another "PA and Lateral Chest" X-ray, which

revealed "no change from the prior study."  TR 172.  Dr. Byram diagnosed Plaintiff with

"bronchitis" and "dypnea."  *Id.*

On March 16, 1998, Plaintiff was admitted to the St. Thomas Hospital ER and treated by

Dr. George J. Cooper for an overdose and suicide attempt.  TR 430-440.  Dr. Cooper reported

that Plaintiff had a "long history of anxiety and depression."  TR 430.  Dr. Cooper also reported

that Plaintiff had "recently seen Dr. Ralph Hobbs who prescribed her sixty Valium," and that she

had "sold half the Valium for a bag of marijuana and states she took between twenty and thirty

Valium earlier this afternoon."  *Id.*  Upon physical examination, Dr. Cooper found that Plaintiff's

lungs, heart, abdomen, and extremities were "normal."  TR 430-431.  Dr. Cooper ordered

---

[4]The ER record contains illegible handwriting, but mentions Plaintiff's crack cocaine use,
as well as her "D & A abuse."  TR 177.

laboratory tests, which were "positive for benzodiazepines and marijuana." TR 431. Dr. Cooper referred Plaintiff to the Mental Health Cooperative, Inc. ("MHC"). TR 164.

Also on March 16, 1998, Ms. Roysan Allen[5] treated Plaintiff at MHC following her suicide attempt. TR 163-164. Ms. Allen recorded that Plaintiff reported that she was homeless after her boyfriend had "kicked her out" (TR 163), that she had "traded 30 Valium for THC & OD on other 30" (TR 164), and that she had smoked marijuana that day (TR 163). Ms. Allen also recorded Plaintiff's statement that, at the time of treatment, she was working as a "feeder" for USA Today, and was planning to move to Florida. TR 163. Ms. Allen indicated that Plaintiff was "allowed to leave" because of her "goal oriented thought processes and supportive family." *Id.*

Also on March 16, 1998, the Mobile Crisis Response Team ("MCRT") from MHC assessed Plaintiff and recorded her "tearful" interview, her husband's history of abusing her, and her addiction to "crack." TR 437-438. Plaintiff indicated that her husband had written to her from prison and had requested a divorce, and that she had problems with both her boyfriend and her husband "rejecting her at the same time." TR 438. Plaintiff signed a "No Harm Contract." TR 439.

On April 2, 1998, Dr. Cooper admitted Plaintiff to St. Thomas Hospital for complaints of chest pain. TR 414-427. Dr. Cooper noted that Plaintiff experienced "elevated BP" and "episodic chest pain" after starting "Cardizem CD." TR 419. Dr. Cooper's physical examination of Plaintiff revealed "full range of motion in all major joints," and that her chest pain "increased with left arm movement." TR 420. Dr. Cooper recommended that Plaintiff

---

[5]The document lists "Roysan Allen" as the "Care Provider." TR 163.

discontinue using "Cardizem CD" and referred her to "Dr. [Ralph] Hobbs" at the "walk-in clinic." *Id.*

On April 27, 1998, Dr. Byram treated Plaintiff at the CMC ER for "chest pain tender to palp x 2 weeks." TR 166-167. Upon physical examination, Dr. Byram noted that Plaintiff's chest was "clear" and "tender" to "palpation." TR 166. Dr. Byram ordered a "PA and Lateral Chest" X-ray, which revealed "no change" and "normal" results. TR 166-167. Dr. Byram also ordered an electrocardiogram ("ECG"), which revealed "normal" results. TR 168-169. Dr. Byram diagnosed Plaintiff with "acute chest wall pain," and prescribed Toradol and Ativan. TR 166.

On May 1, 1998, Dr. Hobbs referred Plaintiff to Dr. Marcel Y. Eluhu because of Plaintiff's "known history of smoking and a strong family history of coronary artery disease" and "recurrent chest pain." TR 178. Dr. Eluhu performed a "[l]eft cardiac catheterization, coronary, arteriogram and left ventriculography" (TR 180-186), which revealed "[n]ormal coronaries with good left ventricular function." *Id.* Dr. Eluhu suggested that Plaintiff stop smoking. TR 179.

On June 13, 1998, Dr. Byram treated Plaintiff at the CMC for a complaint of "left chest pain." TR 189. Dr. Byram ordered an ECG, which was "abnormal," and revealed "poor R wave progression." TR 190. Dr. Byram again diagnosed Plaintiff with "acute chest wall pain," and prescribed Toradol and Lasix. *Id.*

On July 28, 1998, Dr. Kenneth L. Holbert treated Plaintiff for a complaint of chest pain. TR 187. Dr. Holbert ordered an ECG, which revealed "normal" results. TR 188. Dr. Holbert diagnosed Plaintiff with "chest pain; musculoskeletal." TR 187. Dr. Holbert referred Plaintiff

11

to Dr. Hubert Gaskin.  *Id.*

On July 30, 1998, Dr. Gaskin treated Plaintiff for chest pain, noting that Plaintiff had helped lift a person into a wheelchair, which had caused her chest pain.  TR 230.  Dr. Gaskin indicated that Plaintiff's physical examination was "normal," and he diagnosed her with "costichindritis [*sic*]," "anxiety and depression," and "obesity."  *Id.*  Dr. Gaskin prescribed "warm packs," Motrin, and Lortab.  *Id.*

On August 27, 1998, Dr. Gaskin ordered a "right lower extremity deep venous doppler ultrasound," which indicated "[n]o sonographic evidence for deep venous thrombosis in the right lower extremity deep venous system."  TR 252.

On November 4, 1998, Dr. Gaskin ordered a "chest PA & lateral" X-ray, which revealed that Plaintiff's heart was "normal" in size and "free of acute infiltrates."  TR 251.

On November 11, 1998, Dr. Joe R. Fite treated Plaintiff for "sharp-burning-mid chest & very tender to touch."  TR 257-259.  Upon physical examination, Dr. Fite found that Plaintiff's chest was "tender to palp[ation]."  TR 257.  Dr. Fite ordered a chest X-ray and ECG, which revealed "normal" results.  TR 257-259.  Dr. Fite diagnosed Plaintiff with "chest wall pain" and "bronchitis," and prescribed Toradol.  TR 257.

On November 12, 1998, Dr. Gaskin ordered an X-ray of Plaintiff's chest, which revealed that "[c]ardiomediastinal size and configuration are normal," "lungs are clear," and "thorax and chest wall are unremarkable."  TR 250.  The X-ray also revealed "no changed compared to" a July 28, 1998 X-ray.  *Id.*

On December 3, 1998, Dr. Gaskin treated Plaintiff for her complaints of "difficulty

12

breathing" and "cough and congestion" for three weeks.  TR 223.[6]  Dr. Gaskin indicated that

Plaintiff's physical examination was unchanged from previous examinations.  *Id.*  Dr. Gaskin

diagnosed Plaintiff with "anxiety," "depression," "sleep apnea," and "bronchitis."  *Id.*  Dr.

Gaskin's treatment plan included a referral "to psychologist / psychiatrist," and a referral to a

"pulmonary physician for evaluation."  *Id.*

On December 7, 1998, Dr. Gaskin consulted with Plaintiff regarding her test results, as

well as her complaint of shoulder pain; his assessment included sleep apnea, anxiety, and

depression.  TR 222.  Dr. Gaskin stated that Plaintiff's EEG was "WNL."  *Id.*  Dr. Gaskin

diagnosed Plaintiff with "mylagia [*sic*]" in her right shoulder, ordered a "standard

polysomnogram," and prescribed "warm packs" and Tylenol.  *Id.*

On December 17, 1998, Dr. Gaskin treated Plaintiff for her complaints of "severe

stomach pain" and "vomiting blood" once a day.  TR 220.  Upon physical examination, Dr.

Gaskin found that Plaintiff had a "tender epigastric region and LLQ."  *Id.*  Dr. Gaskin referred

Plaintiff to "a GI" specialist and prescribed Tagamet.  *Id.*

Also on December 17, 1998, Dr. Joyce Semenya signed a "Certificate to Return to

Work/School" indicating that Plaintiff could return to work on December 19, 1998.  TR 219.

On January 8, 1999, Dr. Byram treated Plaintiff for her complaint of "sharp & stabbing

---

[6]The record contains laboratory work ordered by Dr. Gaskin, dated from June 16, 1998 to
July 5, 2000, that includes the following: a "chemzyme plus," "CBC, platelet CT, RDW &
differential" (TR 246); a "CBC" (TR 243-245); a "lipid panel," a "CBC," "comprehensive
metabolic panel," and "thyroid stimulating hormone" (TR 241-242); another "lipid panel" (TR
239); three abdominal "culture/lesions" (TR 236-238); a "lipid panel," "comp metab panel,"
"CBC," "antinuclear antibodies," and "thyroid stimmulating [*sic*] hormone" (TR 234-235); and a
"CBC" test (TR 233).  The record also contains a CMC Rehabilitation Services report, which
records Plaintiff's abdominal "wound" treatment and progress from July 10, 2000 to July 17,
2000.  TR 231-232.

Case 3:03-cv-01086   Document 9   Filed 12/14/05   Page 13 of 48 PageID #: 13

pain" on the right side of her chest. TR 255. Upon physical examination, Dr. Byram found that Plaintiff had "good arm movement" and a "tender" chest. *Id.* Dr. Byram ordered an ECG, which revealed "borderline" results. TR 256. Dr. Byram diagnosed Plaintiff with "acute chest wall pain," and prescribed Toradal. TR 255.

On January 11, 1999, Dr. Ron E. Pruitt composed a letter to Dr. Semenya concerning Plaintiff's conditions. TR 260. Dr. Pruitt recorded that Plaintiff experienced "severe epigastric and left upper quadrant discomfort," and that she "vomited blood on two occasions." *Id.* Dr. Pruitt stated that he performed an "[u]pper endoscopy" that "demonstrate[d] a hiatal hernia with a GE junction." *Id.* Dr. Pruitt also stated that he prescribed a "double dose of Tagamet" for Plaintiff. *Id.*

On February 10, 1999, Dr. David D. Buckman treated Plaintiff at the CMC for her complaints of "[c]hest pain" and "pressure, located in the mid-sternum and radiating into the left arm and left shoulder." TR 261. Dr. Buckman ordered a chest X-ray and ECG of Plaintiff, which revealed "normal" results. TR 263-264. Dr. Buckman's impressions of Plaintiff were "[c]hest pain" and "[h]iatal hernia." TR 262. Dr. Buckman recommended that Plaintiff "[f]ollow up with Dr. Gaskin in 3-5 days," "[c]ontinue Prevacid and Adalat," and start Regland and a "liquid antacid 4 times a day." *Id.*

On February 15, 1999, Dr. Gaskin saw Plaintiff for a follow-up examination regarding her ER visit for chest pain. TR 217. Upon physical examination, Dr. Gaskin found that Plaintiff's lungs and heart were "normal." *Id.* Dr. Gaskin diagnosed Plaintiff with "GERD" and "acute bronchitis." *Id.* Dr. Gaskin prescribed Erythromycin, and instructed Plaintiff to continue taking her "GERD" medications. *Id.*

In a letter to Dr. Pruitt, dated March 16, 1999, Dr. Albert T. Spaw described Plaintiff's "severe, worsening gastroesophageal reflux disease" and her "moderate-sized hiatal hernia." TR 265. Dr. Spaw noted that Plaintiff was "dependent on Prevacid" and recommended a "laparoscopic Nissen fundoplication." TR 265-266.

On March 26, 1999, Dr. Spaw admitted Plaintiff to the CMC (TR 269) and performed a "[l]aparoscopic [n]issen fundoplication" (TR 270-272) to help with her gastroesophageal reflux disease.

On March 8, 2000, Dr. James E. McGriff performed an "[e]xcision [of a] mass, left lower abdominal wall." TR 301-305. Dr. McGriff removed a "left lower quadrant abdominal mass" from Plaintiff, and determined that it was "consistent with lipoma." TR 566-568.

On May 4, 2000, Dr. Gaskin noted that Plaintiff's husband had died 10 days before, and that Plaintiff suffered from anxiety and depression as a result. TR 202. Dr. Gaskin instructed Plaintiff to continue taking her medications, and prescribed Valium. *Id.*

On July 5, 2000, Dr. Gaskin treated Plaintiff following an ER visit. TR 198.[7]

On May 22, 2000, the Submitted Note ("SN") from the MHC indicated that Plaintiff was referred to the MHC because she "presented with a plan of drinking herself into oblivion and driving into a concrete wall," and because she had tested positive for "Morphine, THC, Benzos, and opiates." TR 162.

Also on May 22, 2000, Dr. James Hart treated Plaintiff at CPP following her admission for "evaluation and treatment of depression with suicidal ideation and polysubstance abuse." TR

---

[7]This record was photocopied with another piece of paper over it, which obscured the copy and made a large portion undecipherable. TR 198.

310-311.  Plaintiff was discharged on May 25, 2000, and her "discharge diagnosis" was: "Axis I: Major depressive episode, recurrent.  Polysubstance abuse.  Axis II: Mixed personality disorder. Axis III: Recent removal of fatty tumor from abdomen.  Hypertension.  History of bronchitis. Status post hysterectomy.  Axis IV: Severe due to death of husband.  Axis V: Current GAF 50, highest GAF in the past year is 65."  TR 311.

On July 4, 2000, Dr. Rene Saunders treated Plaintiff for her complaint of "leg swelling." TR 322.  Dr. Saunders ordered a chest X-ray, which revealed "no active cardiopulmonary disease" and "no significant interval change from 06/09/00."  TR 322-323.  Dr. Saunders diagnosed Plaintiff with "[d]ependent lower leg edemia [*sic*]," and prescribed Lasix.  *Id.*

On July 31, 2000, Dr. Gaskin saw Plaintiff for a follow-up appointment concerning her abdominal "wound care."  TR 195-196.  Dr. Gaskin's examination revealed that Plaintiff had a "large deep wound" in her "LUQ."  TR 195.  Dr. Gaskin diagnosed Plaintiff with an abdominal "abscess" (TR 195) and referred her to physical therapy (TR 194).[8]

On August 15, 2000, Registered Nurse Sherrill Green conducted an "Initial Assessment" of Plaintiff at MHC, upon referral from her "primary care physician."  TR 158-159.  Nurse Green reported that Plaintiff had been depressed for five months, had admitted "suicidal ideations last week," and had "struggled with intermittent suicidal ideations for the past two months," but did not have "any plan or intent towards self-harm."  TR 159.  Plaintiff's husband had died of cancer in April 2000, and Nurse Green recounted Plaintiff's report that she was

---

[8]The record contains a "progress note" from STAR Physical Therapy, dated June 16, 2000, that was faxed to Dr. McGriff.  TR 312-313.  It documented Plaintiff's "acetic acid solution" treatment for her "infected wound."  TR 313, 564-565.  On August 15, 2000, Dr. Gaskin had a follow-up appointment with Plaintiff, and noted that her "[a]bdominal wound ha[d] healed well."  TR 193.

16

"often getting very mad and angry about his death." *Id.* While Nurse Green noted that Plaintiff asserted that the relationship had been "tumultuous," she also noted "that they reconciled in 1998 and that their relationship was improving." *Id.* Nurse Green indicated that Plaintiff had denied using crack cocaine in the past three years, but had admitted to drinking alcohol and smoking marijuana. *Id.*

Nurse Green recorded Plaintiff's "Past Psychiatric History," noting that Plaintiff had reported her diagnosis of depression in 1994. TR 159. Plaintiff also reported treatment of her depression with "psychotropic medication," such as Elavil, Zoloft, Paxil, Prozac, Effexor, Trazodone, and Valium. *Id.* Plaintiff asserted that Valium had been the "most helpful," that Ativan had been temporarily helpful, and that she had experienced "visual problems and dizziness" from Imipramine. *Id.* Plaintiff stated that she had attempted suicide in 1994, had overdosed on Doxepin, and could not recall how many times she had "been in rehab." *Id.* Plaintiff reported that she took Adalat, Zocor, Estrace, and Zantac. TR 160.

Nurse Green reported Plaintiff's "Past Medical History," stating that Plaintiff's primary care physician was Dr. Gaskin, and that she was receiving treatment for hypertension. TR 160. Nurse Green noted that, prior to this assessment, Plaintiff had been treated for third and fourth degree burns in 1976, and for a myocardial infarction in 1997, and that she had undergone a total abdominal hysterectomy in 1999. *Id.*

Nurse Green's "Mental Status Exam" of Plaintiff revealed that Plaintiff was depressed in her "mood and affect," was "quite tearful throughout the interview," and experienced "intermittent suicidal ideations." TR 160. Nurse Green's diagnostic impressions of Plaintiff were: "Axis I: Major depressive episode, recurrent, severe without psychosis. Polysubstance

17

abuse.  Axis II: Deferred.  Axis III: Hypertension.  Total abdominal hysterectomy in 1999.  Mild

myocardial infarction in 1997.  Axis IV: Severe.  Death of husband.  Financial stress.  Axis V:

Current GAF 50."  TR 161.[9]

The record also contains five SN evaluations of Plaintiff, each from August 15, 2000.

TR 150-157.  The first evaluation, conducted at 9:00 a.m. by Nurse Green, differed from the

evaluation above (TR 161) in regard to the third and fifth axes (TR 157-158), stating: "Axis III:

HTN, removal of benign abdominal tumor March 2000, TAH (1999), mild MI (1997), burn

injury (1976)" and "Axis V: 40."  TR 157.

The second evaluation, conducted at 11:30 a.m. by Ms. Rebecca Smith,[10] records

Plaintiff's medications and her "[v]ital signs."  TR 156.  The third evaluation (TR 152-155) is a

verbatim reproduction of the "Initial Assessment" (TR 159-161).

The fourth evaluation, conducted by Ms. Carmella Machon,[11] noted: "Dr. Gaskin, PCP,

called to request a crisis assessment.  The client is suicidal and depressed."  TR 151.  Ms.

Machon also noted that Plaintiff had lost her job a month prior to the evaluation, that she was

"suicidal and depressed," and that she had symptoms of decreased sleep, decreased appetite,

increased crying spells, and reckless driving.  *Id.*

Ms. Jules Pivovamik conducted the fifth evaluation.[12]  TR 150.  She noted that Plaintiff's

---

[9]Nurse Green also completed a handwritten record from the same day, August 15, 2000, in which she assessed Plaintiff along the same five axes.  TR 158.  The handwritten evaluation is substantively identical to the typewritten version (TR 157), with minor variations such as abbreviations (TR 158).

[10]The record does not indicate Ms. Smith's professional title.  TR 156.

[11]The record does not indicate Ms. Machon's professional title.  TR 151.

[12]The record does not indicate Ms. Pivovamik's professional title.  TR 150.

18

appearance was "disheveled," her speech was "shaky," and her mood was "depressed and anxious with congruent affect." *Id.*

On August 23, 2000, Ms. Tanya Bowers issued a letter indicating that Plaintiff was "unable to work at this time due to the severity of her symptoms."[13] TR 149.

Also on August 23, 2000, Dr. Byram treated Plaintiff for her "sharp" chest pain. TR 317. Upon physical examination, Dr. Byram assessed Plaintiff's chest as "tender LSB." *Id.* Dr. Byram ordered a chest X-ray which revealed "normal" results. TR 318. Dr. Byram also ordered an ECG which revealed "abnormal rhythm ECG." TR 319. Dr. Byram diagnosed Plaintiff with "acute chest wall pain," and prescribed Toradol. TR 317.

On August 24, 2000, Nurse Green consulted with Plaintiff, who asserted that she was "feeling better," but that she was still grieving from her husband's recent death. TR 146-147. Nurse Green found that Plaintiff's mood was "depressed," her affect was "mildly anxious," and her sleep and appetite were "poor." TR 147.

On August 30, 2000, Dr. Eluhu treated Plaintiff for heart problems, recorded her medication, and scheduled a "Stress Cardiolite Study" for August 31, 2000. TR 518-519.

On September 5, 2000, Dr. Daphne Marian Brady-Pitts treated Plaintiff for "chest discomfort" and "fast heart rate." TR 314. Dr. Brady-Pitts' physical examination of Plaintiff revealed that Plaintiff had "clear lungs," and that her chest was "non tender to palpation." *Id.* Dr. Brady-Pitts ordered a "chest PA and lateral" X-ray and ECG, both of which returned "normal" results.[14] TR 315-316.

---

[13]The letter is addressed "To Whom it may concern." TR 149.

[14]The "medication/treatment" notes are illegible. TR 314.

On September 7, 2000, Plaintiff had a follow-up appointment with Nurse Green (TR 143, 145) and Ms. Tanya Bowers (TR 144). Nurse Green recorded that Plaintiff conveyed her concern about an upcoming date, which would have been her 17th wedding anniversary. TR 143. Plaintiff also reported that she was "nervous," but that her medication was "helping some." *Id.* Ms. Bowers noted that Plaintiff attributed "great stress" to her living environment, and also noted Plaintiff's concern for her daughter, who she feared was "sleeping with all her boyfriends and may have children out of those relationships." TR 144. Ms. Bowers recorded that Plaintiff did not have an income, and that her mother was supporting her. *Id.* She advised Plaintiff to "apply for ssi" and to "apply for foodstamps." *Id.*

Plaintiff did not attend a September 18, 2000 appointment (TR 140), and MHC sent her a letter (TR 139). Plaintiff's treatment was "terminated" on September 28, 2000, because she was "non compliant with treatment." TR 138.

On October 9, 2000, Nurse Green saw Plaintiff, and reported that Plaintiff manifested an "irritable mood," that she "[r]eports getting agitated easily," and that she "appears to have a chaotic living situation." TR 137. Nurse Green also reported that Plaintiff's appetite was decreased, and that she denied using "illicit drugs." *Id.*

On October 23, 2000, Nurse Green recorded that Plaintiff was "easily agitated" and that she experienced "mood swings," "racing thoughts," and "feeling restless." TR 136. Nurse Green stated that Plaintiff was abusing "benzo," alcohol, and "cannibis [*sic*]." *Id.*

On November 3, 2000, Plaintiff was admitted to the CMC for "pain and drainage at the old incision site," which was characterized as "cellulitis." TR 475-476.

On November 6, 2000, Nurse Green indicated that Plaintiff had "mood swings,"

insomnia, and "nerves," and she noted that Plaintiff's daughter, who attended the appointment, had reported that Plaintiff was hostile with her family. TR 135. On November 11, 2000, Nurse Green recorded that Plaintiff reported that she was experiencing a "better" mood and less irritability, that she used cannabis and alcohol, and that she was able to sleep through the night. TR 134. Nurse Green also recorded that Plaintiff had expressed concern about the upcoming holidays. *Id.*

On November 30, 2000, Dr. Eluhu ordered a "Stress Cardiolite Study" for Plaintiff, the result of which was "negative." TR 515-525.

On November 31, 2000, Dr. Lawrence G. Schull completed a form entitled "Analysis by DDS Medical Consultant." TR 325. Dr. Schull assessed Plaintiff as follows: "Physical impairment(s) not severe, singly or combined." *Id.*[15]

On December 4, 2000, Dr. Rudra Prakash assessed Plaintiff as "[i]nactive in recovery," and suffering from "severe" depression. TR 133.[16] Dr. Prakash increased Plaintiff's prescription of Celexa to "40 mg," instructed her to continue her other treatment, and "[e]ncouraged her to be active in [r]ecovery." *Id.*

On December 11, 2000, Plaintiff underwent a Residual Functional Capacity Assessment ("RFC").[17] TR 340-343. Plaintiff was assessed as "[m]oderately [l]imited" in her abilities to "understand and remember very short and simple instructions," to "carry out detailed

---

[15]The handwritten notes on this record are illegible. TR 325.

[16]The record contains eight "MED Mgt." documents from December 4, 2000 to February 26, 2001, in which Dr. Prakash evaluated Plaintiff's "MSE," her progress, and her medications. TR 125-133. "MSE" is a category of assessment criteria described as "affect; attention/ concentration; impulse control; insight/judgment; memory; mood; speech." TR 125.

[17]The signature on the RFC is illegible. TR 340-343.

21

instructions," to "maintain attention and concentration for extended periods," to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," to "interact appropriately with the general public," and to "set realistic goals or make plans independently of others." TR 340-341.

Also on December 11, 2000, a consultant completed a Psychiatric Review Technique Form ("PRTF") regarding Plaintiff.[18] TR 326-339. The consultant found an "RFC Assessment Necessary," and based this finding upon "[a]ffective [d]isorders" and "[s]ubstance [a]ddiction [d]isorders." TR 326. Plaintiff's "[a]ffective [d]isorders" were attributed to "[d]epressive syndrome" characterized by "[s]leep disturbance," "[d]ecreased energy," "[d]ifficulty concentrating or thinking," and "[t]houghts of suicide." TR 329. Plaintiff's "[s]ubstance [a]ddiction [d]isorders" were attributed to "[p]ersonality disorders," which were characterized by "[p]ersistent disturbances of mood or affect," and "[p]athological dependence, passivity, or aggressivity." TR 333-334. The consultant assessed that Plaintiff had "moderate" limitations in the areas of "[r]estriction of [a]ctivities of [d]aily [l]iving," "[d]ifficulties in [m]aintaining [s]ocial [f]unctioning," and "[d]ifficulties in [m]aintaining [c]oncentration, [p]ersistence, or [p]ace." TR 336. The consultant also indicated that Plaintiff had experienced one or two "[r]epeated [e]pisodes of [d]ecompensation, [e]ach of [e]xtended [d]uration." *Id.* Additionally, the consultant found that Plaintiff's condition did not "establish the presence" of the necessary

---

[18]The signature on the RFC is illegible. TR 326-339.

criteria to satisfy a listing requirement.[19]  TR 337.

On December 18, 2000, Dr. Prakash noted Plaintiff's "[n]on-compliance," "mod." depression, and MSE of "mildly withdrawn," "[d]ysphoric," and "[b]lunted affect."  TR 132.  Dr. Prakash "encouraged her to be compliant."  *Id.*  On January 2, 2001, Dr. Prakash recorded that Plaintiff was "[s]till inactive in mtgs," that her depression had decreased, and that she had fallen the night before.  TR 131.  Dr. Prakash encouraged Plaintiff to seek medical attention for her fall, and reported that she should continue her treatment with the same prescription.  *Id.*

On January 18, 2001, Lisa Bloodworth, BSW, completed a Treating Source Statement ("TSS") form regarding Plaintiff.  TR 345-347.  Ms. Bloodworth assessed Plaintiff's abilities to make "occupational adjustment" as "[g]ood" in the following areas: "[f]ollow work rules," "[r]elate to co-workers," and "[i]nteracts with supervisors."  TR 345.  Plaintiff was assessed as "[f]air" in her ability to "[d]eal with public," and "poor" in her abilities to "[u]se judgment," "[d]eal with work stresses," "[f]unction independently," and "[m]aintain attention and concentration."  *Id.*  Ms. Bloodworth further found that Plaintiff had "difficulty in concentration," and had "[p]oor" abilities to "[u]nderstand, remember, and carry out" instructions.  TR 346.  Plaintiff was assessed as "[p]oor" in the category of "making personal-social adjustments," with the exception of her "fair" ability to "[d]emonstrate reliability."  *Id.*  Additionally, Plaintiff was assessed as being unable to manage her benefits.  TR 347.

On January 23, 2001, Dr. Prakash reported that Plaintiff was cooperative, but tired, and reiterated that Plaintiff's prescription changes from the prior session should be implemented.  TR 129.

---

[19]The "consultant's notes" are partially illegible.  TR 338.

On February 2, 2001, Plaintiff reported nightmares, and her MSE indicated that she was "[a]nxious/dysphoric" and showed "[b]lunted affect." TR 128. Dr. Prakash increased her "Seroquel" to "300 mg." *Id.*

On February 10, 2001, Dr. Semenya treated Plaintiff for her complaint of "chest pain" and shortness of breath. TR 488-497. Upon physical examination, Dr. Semenya noted Plaintiff's "[e]xpiratory wheeze bilaterally, right more than left." TR 488. Dr. Semenya's assessment of Plaintiff was: "[a]cute chest pain associated with shortness of breath; rule out pulmonary embolism," "[b]ronchitis," and "[c]ostochondritis." *Id.* Dr. Semenya prescribed Levaquin and "Nebulizer treatments with Albuterol." TR 489.

On February 19, 2001, Dr. Prakash recorded Plaintiff's "[n]on-compliance" with her treatment, and her "[r]ecent physical illness." TR 127. Plaintiff's MSE was "dysphoric," "[b]lunted affect," and "withdrawn," and Dr. Prakash indicated that Plaintiff should "restart" her prescription. *Id.* On February 26, 2001, Dr. Prakash recorded Plaintiff's "[m]ild improvement in mood" and her "[n]on-del. paranoid thinking." TR 125. Dr. Prakash indicated that Plaintiff had not made an appointment with a therapist. *Id.* Dr. Prakash completed a form entitled "Active Orders," which contained a prescription list and characterized Plaintiff's condition as "[m]ajor [d]epressive [d]isorder, [r]ecurrent, [s]evere with [p]sychotic [f]eatures." TR 126.

On March 14, 2001, Dr. William Regan completed an RFC (Mental) of Plaintiff. TR 348-351. Dr. Regan found Plaintiff "[m]arkedly [l]imited" in her abilities to "understand and remember detailed instructions," to "carry out detailed instructions," and to "interact appropriately with the general public." TR 348-349. Dr. Regan found Plaintiff "[m]oderately [l]imited" in her abilities to "maintain attention and concentration for extended periods," to

24

"complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," and to "respond appropriately to changes in the work setting."  *Id.*

Also on March 14, 2001, Dr. Regan completed a PRTF of Plaintiff.  TR 352-365.  Dr. Regan attributed Plaintiff's "[a]ffective [d]isorders" to "[a]nhedonia or pervasive loss of interest in almost all activities," "[d]ecreased energy," "[f]eelings of guilt or worthlessness," and "[d]ifficulty concentrating or thinking."  TR 355.  Dr. Regan did not find that Plaintiff had a substance addiction disorder or personality disorder.  TR 360-361.  Dr. Regan characterized Plaintiff's "[r]estriction of [a]ctivities of [d]aily [l]iving" and "[d]ifficulties in [m]aintaining [s]ocial [f]unctioning" as "[m]ild."  TR 362.   In his "Consultant's Notes," Dr. Regan opined that Plaintiff had "polysubstance dep." and "MDE non psychotic."  TR 364.

On April 3, 2001, Plaintiff complained of chest pain that radiated across her "entire chest" and "into [her] back," "diaphorisis," and "nausea," which were assessed as "[a]typical chest wall pain" and "[c]ostochondritis."  TR 472.  Plaintiff had an "abnormal ECG" and a "normal" "PA and lateral chest" X-ray.  TR 474.

On May 1, 2001, Plaintiff underwent a Clinically Related Group Assessment ("CRG"), which recorded that Plaintiff had "moderate" limitations in "activities of daily living," specifically finding that she had: "[o]ccasional difficulty w/ transportation" and "[m]ay require assistance."[20]  TR 375.  Plaintiff's CRG also noted that she had a "marked" limitation in her "interpersonal functioning," specifically, she had "[l]ittle support system in place" and "[b]enefits from services."  *Id.*  Plaintiff's limitations were characterized as "moderate" in

_____

[20]There is no signature on the CRG form.  TR 375-380.

25

"concentration, task performance, and pace," and "marked" in "adaptation to change." TR 376.

The evaluator indicated that Plaintiff was "in need of CM/clinic services to remain stable [and]

to prevent relapse for as long as possible." *Id.* Additionally, Plaintiff was assessed as having a

"Severe Mental Illness," (TR 377), and her current, highest, and lowest "GAF" was "48" (TR

378). Plaintiff received a second CRG, which took place on January 9, 2002, and which was

identical to the original CRG, except for the handwritten comments. TR 380.

On August 23, 2001, Paul S. Smith, Ed.D, conducted Plaintiff's second TSS. TR 366-

369. Dr. Smith opined that Plaintiff had "[f]air" abilities to "[f]ollow work rules," to "[r]elate to

co-workers," to "[d]eal with public," and to "[u]se judgment." TR 367. Dr. Smith also found

that Plaintiff "[i]nteract[ed] with supervisors," and could "[f]unction independently" to a "[f]air"

degree. *Id.* Dr. Smith found that Plaintiff had a "fair" ability to "[u]nderstand, remember, and

carry out" "[d]etailed but not complex, job instructions" and a "good" ability to "[u]nderstand,

remember, and carry out" "[s]imple job instructions." TR 368. Dr. Smith's evaluation did not

differ from the previous assessment with regard to Plaintiff's abilities in "making personal-social

adjustments." *Id.*

On September 3, 2001, Dr. Saunders treated Plaintiff for her complaint of "pain to her

abdominal incision," which was assessed as "[e]arly cellulitis, abdominal incision." TR 467.

Dr. Saunders noted that the skin around her abdominal incision had "yellowish green crusting,"

and was "quite darkened to the point of almost an ecchymosis type of appearance." TR 466. Dr.

Saunders also noted that Plaintiff was "not satisfied with the offering of Levaquin as her

antibiotic," and that she additionally received "a prescription for 600 mg Motrin tablets." TR

467.

On October 3, 2001, Dr. Brady-Pitts treated Plaintiff for her complaints of "severe cough" and "chest pain for 4 days." TR 461-463. Dr. Brady-Pitts ordered a "PA and lateral chest" X-ray and ECG, both of which yielded "normal" results. TR 463-464. Dr. Brady-Pitts prescribed Erythromycin, Albuterol, and Lortab, and recommended Tylenol and Motrin for pain. TR 462.

On October 20, 2001, Dr. Byram treated Plaintiff for her complaints of "substernal chest pain" and "frequent cough." TR 456. Dr. Byram noted that Plaintiff was a smoker, and that she had undergone a "cardiac catheterization" in 1998. TR 456. Dr. Byram's impressions were "[a]cute chest pain non-cardiac" and "[h]istory of chest pain." TR 456. Dr. Byram prescribed Celebrex for pain and "a Z pack." TR 457.

On November 4, 2001, Dr. Livingston treated Plaintiff for "[s]everal infections at surgical site," which he found "[n]egative for abscess." TR 454-455. Dr. Livingston treated Plaintiff again on November 14, 2001, for "[a]bdominal pain at old incision site." TR 451-453. Dr. Livingston assessed Plaintiff's condition as "[s]tatus post lipoma removal with poor healing wound, noninfected and nonabscessed," "[h]ypertension," and "[d]rug-seeking behavior." TR 453. Dr. Livingston indicated that Plaintiff was scheduled for a follow-up examination with Dr. Gaskin. *Id.*

On November 29, 2001, Dr. Byram treated Plaintiff for "epigastric pain and chest pain." TR 447-449. Upon orders of Dr. Byram, Plaintiff underwent a "PA and lateral chest" X-ray, which revealed "bibasal infiltrates -- probably pneumonia," and an ECG, which was "normal." TR 447, 449. Dr. Byram diagnosed Plaintiff with "acute chest wall pain, noncardic [*sic*]," and "hypokalemia." TR 448. Dr. Byram prescribed Toradol. *Id.*

From March 26, 2001 to April 9, 2002, Nurse Practitioner Paula Yelverton treated Plaintiff at the MHC.[21] TR 381-400. Over the course of Plaintiff's treatment, Nurse Yelverton repeatedly assessed Plaintiff as having "anxiety" (TR 381, 386, 390-391, 396-399), and "dysphoria" (TR 386-387, 400); Nurse Yelverton also discussed Plaintiff's feelings about her husband's death and her support system (TR 381, 386-387, 390-391, 394, 397, 399). On her Abnormal Involuntary Movement Scale ("AIMS") assessments, Plaintiff was evaluated as showing "none" of the symptoms. TR 388, 395.

On January 3, 2002, Dr. Harry Bonnaire treated Plaintiff for back pain, noted her intolerance to "steroid" shots, and ordered a "total spinal scan." TR 513. Dr. Bonnaire referred Plaintiff to a physical therapist. *Id.*[22]

On January 31, 2002, Dr. Bonnaire ordered numerous scans of Plaintiff following another motor vehicle accident (TR 408-413), and suggested that her "symptoms may be due to: head injury" (TR 407). Plaintiff's CT scan of her head revealed "nondisplaced posterior skull fractures" (TR 409), but all other scans were "normal" (TR 408, 410-413).

On March 25, 2002, Dr. Bonnaire treated Plaintiff for lower back pain. TR 502. Upon physical examination, Dr. Bonnaire noted that Plaintiff had "mild" wheezing. *Id.* Dr. Bonnaire prescribed Flexeril and Lortab.[23] TR 502.

---

[21]Nurse Yelverton evaluated Plaintiff on forms entitled: "Individual Therapy," "Medical Management," "Abnormal Involuntary Movement Scale," "Nursing A/E," and "Urinalysis." TR 381-400.

[22]There are no further treatment notes indicating any additional tests, examinations, or diagnoses. TR 513.

[23]The treatment record is partially illegible, and the legible portions do not indicate any further physical examination, diagnoses, or treatment plans. TR 502.

On March 6, 2002, Dr. Eluhu treated Plaintiff, upon referral from Dr. Bonnaire.  TR 520-523.  Dr. Eluhu completed a "Cardionuclide Imaging Worksheet," which indicated that Plaintiff had a "[n]egative stress cardiolite study."  TR 524.  Dr. Eluhu assessed Plaintiff as having "[a]typical chest pain," "[p]ulmonary HTN by hx," and "[m]ild MR."  TR 523.

Dr. Jei F. Martin assessed Plaintiff, completing a "Physical Capacities Evaluation" on May 12, 2002.[24]  TR 444-445.  Dr. Martin found that Plaintiff could sit for two hours "total at one time," and two hours "total during the entire 8-hour day," and that she could "[s]tand/[w]alk" for two hours "total at one time," and "[s]tand/[w]alk" for two hours "total during entire 8-hour day."  TR 444.  Dr. Martin found that Plaintiff could use her hands for all "repetitive action" listed on the form, and that she could "use feet and/or legs" for all "repetitive movements" listed.  *Id.*

Additionally, Dr. Martin found that Plaintiff could "never" lift 50-100 pounds, "rarely" lift 10 to 19 pounds, "occasionally" lift 10 to 19 pounds or five to nine pounds, and "frequently" lift zero to four pounds.[25]  TR 444.  Plaintiff could "never" carry 50-100 pounds, "rarely" carry 10 to 19 or 20 to 49 pounds, and "frequently" carry five to nine or zero to four pounds.  TR 445.  Dr. Martin opined that Plaintiff could "occasionally" bend, squat, or crawl, and could "rarely" climb or reach above her shoulder.  *Id.*  Plaintiff had no restrictions with regard to "activities involving":  unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, or exposure to dust, fumes, and gases, but she had a "moderate"

_____

[24]The record contains a document entitled "Practitioner Profile Data" concerning the evaluator, Dr. Martin (TR 442-443), and a profile for Dr. Smith (TR 371-374).

[25]Dr. Martin marked both "rarely" and "occasionally" for Plaintiff's ability to lift 10 to 19 pounds.  TR 444.

limitation on "[d]riving automotive equipment." TR 445.

On June 12, 2002, Dr. McGriff operated on Plaintiff, performing an "[e]xcision of abdominal wall fistula." TR 531-535, 552, 557, 560.

On June 13, 2002, Nurse Yelverton evaluated Plaintiff for her third TSS.[26] TR 527-529. Nurse Yelverton found that Plaintiff's abilities to make "occupational adjustments" were "fair" in all areas, except for her ability to "[d]eal with work stresses," which was "fair/poor." TR 527. Nurse Yelverton also noted that Plaintiff "has not worked since admitted to MHC so it is difficult to know exactly how she would respond in a consistent work situation." *Id.* Plaintiff's abilities to "[u]nderstand, remember and carry out" instructions were found to be identical to those in her second evaluation. *See*, TR 528, 368. With regard to Plaintiff's abilities in "making personal-social adjustments," Nurse Yelverton opined that Plaintiff had "fair" abilities in all areas except for her "good/fair" ability to "[m]aintain personal appearance." *Id.* Nurse Yelverton also noted that Plaintiff could become "passive or aggressive in conflicted situations." *Id.*

On June 17, 2002, Dr. Jeffrey Livingston treated Plaintiff at the CMC for complaints of abdominal pain and "bleeding from her incision site." TR 561. Upon physical examination, Dr. Livingston found that Plaintiff had fever and nausea. *Id.* Dr. Livingston ordered laboratory work (TR 562), from which he concluded that Plaintiff had an "incisional infection" instead of an abscess (TR 561-562).[27]

---

[26]This evaluation was cosigned by Dr. Prakash. TR 527-529.

[27]The record contains a document about Plaintiff's "home infusion services," through which she received antibiotic treatment for her infection. TR 550-553.

On June 24, 2002, Dr. McGriff and Dr. Wycliffe L. Wright admitted Plaintiff to the CMC for her complaint of "[a]bdominal pain with drainage from abdominal wound incision." TR 549, 551, 554, 558. Dr. McGriff and Dr. Wright treated Plaintiff with antibiotics and administered "[a]ggressive wound care." TR 549. Dr. McGriff noted Plaintiff's "final diagnoses" as: "[p]ost-operative wound infection," "[b]acterial infection due to Staphylococcus aureus," "[p]enicillin resistant infection," "[d]iabetes," and "[c]oronary artery disease." *Id.* Dr. McGriff prescribed Vancomycin. *Id.*

On May 31, 2002, Dr. McGriff ordered a "CT of the abdomen and pelvis," because of Plaintiff's "[n]onhealing wound" from the removal of her "[n]onmalignant tumor." TR 563. Plaintiff's CT scan was an "unremarkable CT exam of the abdomen and pelvis." *Id.*

### B. Plaintiff's Testimony

Plaintiff was born on May 21, 1962, and has a tenth grade education. TR 574.

Plaintiff testified that her reading and writing skills were "[f]air," and that she could read a newspaper or menu. TR 574. Plaintiff stated that she had not worked since June 1999, and that her employment over the previous 15 years had included positions at temporary services, at a restaurant, with maid services, in construction, and as a cashier. TR 575. Plaintiff reported that, at the time of her hearing, she was "5'3" and weighed 278 pounds, which she characterized as "way overweight." TR 576. Plaintiff testified that her weight problem had caused her diabetes, and that she felt "fatigued easily." *Id.* Plaintiff reported that she had high blood pressure, and that she took medication to control her blood pressure. TR 577.

Plaintiff testified that she had a "bad back," and acknowledged that her doctors referred to it as "degenerative disk disease." TR 577. Plaintiff stated that the pain in her lower back

caused problems for her on a daily basis, and that she had pain after standing for ten minutes. TR 578. She added, "it's hurting now." *Id.* Plaintiff reported that she controlled her back pain with medication, and that her doctor had told her that surgery would not help. TR 578.

Plaintiff also described the pain in her right knee, stating that she experienced "popping" and "swelling." TR 579. She further stated that she had had a heart attack, and that she controlled her chest pain with medication. TR 579-580.

Plaintiff testified that she was diagnosed in 1994 with "carpal tunnel" in both hands, and that she underwent unsuccessful surgery on her right hand. TR 580. Plaintiff asserted that she experienced numbness in her right arm, stating "my arm will go completely asleep." *Id.* When asked if "doing something repetitive" exacerbated the numbness, Plaintiff responded affirmatively. *Id.* Plaintiff further maintained that the numbness was accompanied by pain, which occurred daily, and noted that she was right-handed. TR 581. Plaintiff testified that she did not attempt to lift something as heavy as a gallon of milk, and that she dropped anything as heavy as a "glass of tea." *Id.*

Plaintiff also testified that she had had an abscess in her abdomen caused by a "fatty tumor," and that, after it was removed, the wound "kept setting up infections." TR 597. Plaintiff asserted that she was receiving treatment for the condition; she explained that she was "on a machine called a Wingback [phonetic]," and that she was scheduled to see a doctor the next day. TR 598.

Plaintiff reported that she had applied for benefits in 1989 because of "a car wreck with my back," in 1992 because of another "car wreck," and in 1995 because of "carpal tunnel syndrome." *Id.*

Plaintiff testified that she had last used drugs in 1997.  TR 582.  Plaintiff stated, that, at the time of the hearing, she was not using drugs and alcohol, and that she was receiving mental health treatment at the "Mental Health Co-Op."  *Id.*  Plaintiff asserted that she had been diagnosed with bipolar disorder.  *Id.*  Additionally, Plaintiff testified that she experienced bouts of depression, stating, "I've tried to kill myself several times."  TR 583.  Plaintiff estimated the number of suicide attempts as "[a]bout six," and reported that her last suicide attempt had been on May 22, 2000.  *Id.*  Plaintiff testified that she consistently attended monthly appointments at the "Mental Health Co-Op.," and that she took her prescribed medications.  *Id.*  Plaintiff stated that she had daily "crying spells," and opined that her depression contributed to her inconsistent eating patterns, trouble sleeping, and poor concentration.  TR 584-585.  Plaintiff testified: "My memory is short.  Sometimes I can remember stuff, sometimes I can't."  TR 585.

Plaintiff reported that she also met with psychologist, Dr. Paul Smith, on a weekly basis.  TR 585.  When asked if Dr. Smith's diagnosis of "agoraphobia" applied to her, Plaintiff responded that "Kroger's or K-Mart" was the type of place that would make her "get real nervous and shake and sweat" or "faint."  TR 585-586.

Plaintiff testified that her daily activities included "[s]itting on the couch and not watching no [*sic*] TV."  TR 586.  Plaintiff stated that she lived by herself in an apartment, and that she did not have to climb any stairs to get to her apartment.  TR 587.  Plaintiff asserted that she did her household chores "[n]ot very good."  *Id.*  Plaintiff reported that she did not shop, and did not drive because she did not have a driver's license.  TR 587-588.  Plaintiff testified that she did not clean often, and added that "I got to clean now.  It's bad.  It looks awful in there."  TR 588.  Plaintiff reported that she stayed in bed all day, "[a]lmost every day."  *Id.*  Plaintiff also

33

testified that she was able to take care of her hygiene needs.  TR 589.

Plaintiff reported, "I got into Section 8 and they've been paying my bills for me."  TR 589.  Plaintiff asserted that she had tried to work again: "I've tried and I just couldn't be around people."  *Id.*  Plaintiff clarified that her depression and thoughts about suicide "all the time," kept her from working.  *Id.*

Plaintiff stated that her brother was the only family member who visited her.  TR 590.  Plaintiff testified that her "Mental Health Co-Op." caseworker helped her with transportation and referral to other services.  *Id.*  Plaintiff stated that she used food stamps, and that she had children who were older than 18 years of age and who did not live with her.  TR 591.

The ALJ asked Plaintiff where she had worked as a cashier, to which Plaintiff replied that she had worked for a total of five years, until 1999, at McDonald's, Burger King, "Walla-Burger [*sic*]," and Kroger.  TR 591.  Plaintiff stated that she had worked at Kroger for six months, and that she had to stand all the time and lift bags.  TR 592.  Plaintiff testified that she had worked in housecleaning for a "pretty good while because I would do it on the side."  TR 592.  Plaintiff stated that she might have made $1,000 per month cleaning houses, and characterized the lifting required as "taking out the trash, moving furniture."  *Id.*  Plaintiff stated that she had worked in housecleaning both on her own, and "for an established company."  TR 593.  Plaintiff also described her past job driving cars for an auto auction, for which she earned approximately $40 per day "after taxes and everything."  TR 593-594.  Plaintiff testified that she had worked "[f]or about a month" in construction, unloading tractor trailers.  TR 594.  Plaintiff stated that she had worked at McDonald's for approximately one month and had earned approximately $600, but that she had stopped working because of her husband's death.  TR 597.

Plaintiff stated that she did not have any side effects from the medications that she took. TR 594. Plaintiff testified that she lived alone, and that she was responsible for the upkeep of her apartment because she did not have any help. *Id.*

Plaintiff also testified that she experienced back pain in colder weather, and that she experienced more pain during rainy weather. TR 594-595. Plaintiff stated that, in comparison to August of the previous year, she felt "[a]bout the same." TR 595.

Plaintiff reported that she smoked approximately one pack of cigarettes per day, and that her friend, Dale Whitehead, brought the cigarettes to her daily. TR 595. Plaintiff testified that she had not had any alcohol or crack since her "drug rehab" in 1997. TR 595-596. Plaintiff stated that she had smoked one "joint" since 1997, which she had smoked "about a month ago." TR 596. Plaintiff denied that she took prescription drugs that were prescribed for another person. *Id.*

### C. Vocational Testimony

Vocational expert ("VE"), Jane Brenton, also testified at Plaintiff's hearing. TR 570. The VE classified Plaintiff's past relevant work as a fast food cashier, in housecleaning, and as an automobile auction driver, each as "light" and "unskilled," and Plaintiff's cashier positions at Kroger as "medium" and "semi-skilled." TR 598-599.

The ALJ presented a hypothetical incorporating the mental limitations from a Mental RFC, dated March 14, 2001, asking the VE to consider the "comments as well as the particular check marks."[28] TR 599-600. The ALJ also added that the hypothetical claimant was "limited to light work," could "stand or walk for no more than six hours out of an eight-hour day, no

_____

[28]The Mental RFC evaluation is found in the record at TR 348-351.

crawling, no ladders, ropes, or sscaffolds," could "only occasionally climb stairs, ramps, balance, stoop, bend, kneel, or crouch," and "[s]hould avoid extremes in temperature, dampness, wetness, and humidity, in reference to her medications, hazardous machinery and unprotected heights." TR 599-600. The ALJ asked whether the hypothetical claimant could perform any of Plaintiff's past relevant work. TR 600. The VE answered that the hypothetical claimant could not perform any of Plaintiff's past relevant work, nor could such a claimant perform any work. *Id.*

The ALJ then modified the hypothetical to change the hypothetical claimant's "marked" limitations to "moderate" limitations, and asked whether such a claimant could perform any work. TR 600. The VE opined that, in the State of Tennessee, there were approximately 3,200 cashier positions, 3,700 receptionist or grader positions, and 1,000 information clerk positions, all of which would be appropriate for the hypothetical claimant. *Id.*

The ALJ further modified the hypothetical, asking the VE to "[u]se sedentary work." TR 601. The VE opined that, in the State of Tennessee, there were approximately 6,500 cashier positions, 2,800 greeter or receptionist positions, and 1,000 information clerk positions, that would be appropriate for such a person. *Id.*

The ALJ again modified the hypothetical, asking the VE to accord "full credibility" to Plaintiff's testimony. TR 601. The VE replied that, if Plaintiff's testimony was fully credible, no work would be available because of her "decrease in concentration, decrease in memory, decrease in her ability to cope or to go outside, deal with other people," her "pain" and "[b]eing easily fatigued." *Id.*

Plaintiff's attorney then asked the VE to consider "Dr. Martin's assessment," which stated that Plaintiff could sit, stand, and walk for two hours in an eight-hour workday, and "Dr.

Paul Smith's assessment," which stated that Plaintiff had a "poor" ability to "handle work stresses, deal with the public," and a "poor" ability to "maintain[] attention or concentration." TR 602. The VE responded that no work would be available. *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the

37

Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[29] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*,

---

[29]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

39

820 F.2d 777, 779 (6ᵗʰ Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that, (1) the ALJ "improperly rejected the opinions of the Treating Physicians, offering no rationale for ignoring or rejecting these opinions," (2) the ALJ "failed to provide the appropriate rationale for his finding that the drug and alcohol abuse were material," and (3) the "ALJ's rejection of the claimant's allegations regarding disabling symptoms of depression and mental disorders is not supported by substantial evidence."  Docket Entry No. 7. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed and remanded for a new hearing.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6ᵗʰ Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record

40

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Weight Accorded to Treating Source Opinions

Plaintiff maintains that the ALJ "improperly rejected the opinions of the Treating Physicians, offering no rationale for ignoring or rejecting these opinions." Docket Entry No. 7. Specifically, Plaintiff argues that the ALJ, in his decision, "fails to discuss the opinion of Ms. Bloodworth entirely," only "briefly references Dr. Smith's medical source statement dated August 23, 2001," and "only briefly refers to Dr. Prakash," but "not in reference to the Treating Source Statement." *Id.* Plaintiff argues that, although the "ALJ does refer to 'various treating source opinions of 'disability' from MHC,'" and does "refer[] to Dr. Prakash's report," "the ALJ adopted his 'own view' and failed to give appropriate weight to the Treating Source Statements." *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent*

41

*with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

When the opinions of treating physicians are inconsistent with each other, however, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

Ms. Bloodworth, Dr. Smith, and Dr. Prakash each completed a Treating Source Statement regarding Plaintiff. TR 345-347, 367-369, 527-529. While the ALJ, in his decision, did not discuss the Treating Source Statement completed by Ms. Bloodworth, he was not bound to do so, as Ms. Bloodworth was a case manager with MHC with a Bachelors degree in Social

42

Work who assisted Plaintiff with such logistical matters as housing. *See, e.g.,* TR 396.

Moreover, although Ms. Bloodworth completed a Treating Source Statement, she did not include

any medical or clinical findings to support the conclusions contained therein. She simply noted

as her support that Plaintiff *reported* difficulties in concentration, difficulties in dealing with

stressful situations, difficulties in caring for herself and in handling herself "appropriately," and

an inability to handle financial matters. *See* TR 345-347. The ALJ is not bound to accept Ms.

Bloodworth's use of Plaintiff's assertions as the support for her conclusions, particularly in light

of the ALJ's explicit finding that Plaintiff's credibility was "very poor." TR 25.

      The ALJ, in his decision, referred to the opinions of Dr. Smith and Dr. Prakash, and

decided to accredit the opinion of Dr. Prakash because it was consistent with the other evidence

of record and with his credibility determination.[30] *See, e.g.,* TR 20, 25. As has been noted, when

the opinions of treating physicians are inconsistent with each other or with the evidence of

record, the ALJ makes the final decision regarding the weight to be given to the differing

opinions. As discussed above, the ALJ chose to accredit the opinion of Dr. Prakash; such a

determination is within his province, and the Regulations do not mandate that the ALJ accord

Ms. Bloodworth's and Dr. Smith's evaluations controlling weight. Accordingly, Plaintiff's

argument fails.

## 2. Alcoholism or Drug Abuse

      Plaintiff argues that the ALJ "failed to provide the appropriate rationale for his finding

that the drug and alcohol abuse were material." Docket Entry No. 7. Plaintiff essentially argues

that the ALJ erred in finding that Plaintiff's drug and alcohol abuse was a material factor in her

---

      [30]The ALJ's decision discusses the medical evidence at great length. *See, e.g.,* TR 16-29.

disability, and that accordingly, the ALJ's decision that she would not be disabled if she refrained from substance abuse was not supported by substantial evidence. *Id.*

With regard to the evaluation of whether drug abuse or alcoholism is a contributing factor material to the determination of disability, the Code of Federal Regulations states:

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling....

20 C.F.R. § 416.935(b).

As an initial matter, the record in the case at bar is replete with doctors' evaluations, medical assessments, and the like, which were properly discussed by the ALJ in his decision. *See* TR 16-29. Additionally, the ALJ's decision discussed the testimony of both Plaintiff and Vocational Expert, Jane Brenton. *Id.* The ALJ's articulated rationale demonstrates that he carefully considered the medical, non-medical, and testimonial evidence of record in determining that Plaintiff's polysubstance abuse was a contributing factor material to the determination of disability. *Id.*

The ALJ acknowledged that Plaintiff's polysubstance abuse/addiction disorder was of ongoing, listing level severity. TR 20. The ALJ further acknowledged, "when considering the claimant's considerable limitations secondary to polysubstance addiction, the Administrative Law Judge must find that the regulatory sequential evaluation process indicates a conclusion of 'disabled.'" *Id.* After identifying and discussing Plaintiff's nonexertional mental limitations

without consideration of her polysubstance abuse/addiction disorder, the ALJ determined, however, that Plaintiff's "mental problems fall far short of disabling severity." TR 21. The ALJ specifically found that:

> absent her polysubstance abuse/addiction disorder, the claimant clearly has no more than a "mild" limitation in activities of daily living, with only a "moderate" limitation in social functioning. Similarly, the claimant has a "moderate" limitation in concentration when understanding, remembering, and carrying out detailed tasks, with no more than a "mild" limitation with regard to understanding, remembering, and carrying out simple repetitive tasks. Absent consideration of the claimant's polysubstance abuse limitations, there are no documented episodes of deterioration or decompensation in work or work-like settings that were of extended duration.

TR 21. The ALJ went on to determine that, "In light of the aforementioned mental functional limitations, ... [Plaintiff] retains the mental RFC to perform a modified but substantial range of unskilled work that is subject to the *moderate* limitations in the specified following areas..." *Id.* (Italics original).

The ALJ also extensively discussed Plaintiff's physical impairments and ailments. *See, e.g.,* TR 21-24. The ALJ noted that Plaintiff's "physical medical problems have imposed [] significant but non-disabling work-related limitations" (TR 23), but he determined that, "absent consideration of her polysubstance abuse/addiction problems, the claimant has not been prevented from performing a modified but substantial range of unskilled light work for a period of 12 continuous months" (TR 22).

The ALJ extensively discussed Plaintiff's allegations of disabling pain and other symptoms, but found that Plaintiff's credibility was "very poor" and that her allegations were "inconsistent with the non-medical and medical record as a whole." TR 25. He therefore

45

determined that Plaintiff's allegations were not credible, and that Plaintiff "has not experienced symptomatology that precludes her from performing the modified but substantial range of unskilled light work." *Id.*

After discussing the VE's testimony and determining that the VE's testimony was "competent, thorough, consistent with the record, and, thus, highly credible," the ALJ found Plaintiff to be "'not disabled' because absent consideration of her addiction to illicit drugs and alcohol, she retains the RFC to perform her past relevant work as a fast food cashier as it is generally performed nationally, as well as alternate work existing in significant numbers in the national economy." TR 26.

Despite Plaintiff's assertions to the contrary, the ALJ extensively articulated his rationale for determining that, "insofar as the claimant cannot be found 'disabled' even if she stopped using drugs and alcohol, [] the claimant's continuing polysubstance abuse/addiction is a factor that is material to the aforementioned conclusion of 'disability.'" TR 28. Accordingly, Plaintiff's argument fails.

### 3. Subjective Complaints of Pain

Plaintiff contends that the "ALJ's rejection of the claimant's allegations regarding disabling symptoms of depression and mental disorders is not supported by substantial evidence." Docket Entry No. 7.

As has been noted, the record here is replete with doctors' evaluations, medical assessments, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." After assessing all of the medical, non-medical, and testimonial evidence, the ALJ determined that Plaintiff's allegations of disabling pain and other

46

symptoms were "inconsistent with the non-medical and medical record as a whole" and "not credible." TR 24-25. The ALJ explicitly stated that he found Plaintiff's credibility "very poor," and noted that Plaintiff "has been less than forthcoming about her obvious continued abuse of illicit drugs and alcohol." TR 25. The ALJ recalled Plaintiff's testimony that she had not abused any substance since 1997, but noted that her medical records from November 2000 contained two admissions about her substance abuse, one involving use of alcohol, marijuana, and morphine, and the other involving use of alcohol, marijuana, and "Lortabs." *Id.* The ALJ stated that "such evidence considerably detracts from her credibility as to any allegation of symptoms, including pain and depression." *Id.*

The ALJ also noted two records which referenced Plaintiff's possible "drug-seeking behavior." TR 19-20. In his decision, the ALJ cited specific medical evidence of Plaintiff's mental impairments and addiction, including a March 16, 1998 record from MHC which indicated Plaintiff had overdosed on Valium, had used marijuana, and was experiencing anxiety and depression. TR 19. The ALJ discussed additional MHC records, including one that indicated "depressive and dependent personality disorders" (TR 19), and others that indicated that "polysubstance/abuse continued as prominent diagnoses" (TR 20). The ALJ considered Plaintiff's allegations of depression and mental disorders, as well as the medical records, and concluded that Plaintiff had "severe medically determinable impairments due to a polysubstance (alcohol, cannabis, and cocaine) abuse/addiction disorder with secondary depression and anxiety, obesity, and recurrent wound impairments . . . " TR 18. As has been noted, this determination is within the ALJ's province.

The ALJ observed Plaintiff during her hearing, assessed the medical records, and

Case 3:03-cv-01086   Document 9   Filed 12/14/05   Page 47 of 48 PageID #: 47

reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

E. CLIFTON KNOWLES
United States Magistrate Judge

48